**Stephen K. LEONARD, Petitioner,**

**v.**

**DEPARTMENT OF the NAVY, and Honorable H. Lawrence Garrett, III, and Commander, Naval Military Personnel Command and Captain H.M. Wilson, Respondents.**

Civ. No. 91–0212–P–C.

United States District Court, D. Maine.

Feb. 27, 1992.

F. Terison, Asst. U.S. Atty., Portland, Me., for respondents.

James Bushell, Portland, Me., for petitioner.

## MEMORANDUM OF DECISION AND ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

GENE CARTER, Chief Judge.

Petitioner Stephen K. Leonard filed a petition for a writ of *habeas corpus* with this Court on June 26, 1991, pursuant to 28 U.S.C. section 2241, for the purposes of judicial review of a decision of the Commander of the Naval Military Personnel Command, Department of the Navy, denying his Request for Discharge as a Conscientious Objector (hereinafter "CO"). Petitioner alleges that the denial was arbitrary and capricious, and without any basis in fact, that it was based upon erroneous standards contrary to the regulations of the Department of Defense, and that procedural delays and defects constituted a denial of due process.

### I. *Facts*

Petitioner is a twenty-three-year old enlisted member of the United States Navy. He grew up in a large, nonpracticing Christian family. His mother was a Roman Catholic; his father, an Air Force veteran, was a Baptist. His three older brothers have served honorably in the Navy. After completing high school in May 1985, Petitioner became a "born-again" Christian in June 1985. Petitioner worked as a delivery driver for one year, and then enrolled in Gordon College, a Christian college. While enrolled there, he became acquainted with the beliefs and principles of the Society of Friends, including the doctrine of conscientious objection to warfare, through his roommate who was a Quaker and conscientious objector from Maine.

During his last year at Gordon College, Petitioner went through a period of personal and spiritual dissatisfaction. On July 19, 1989, he voluntarily enlisted in the Navy for a four-year tour. After completing recruit training in September 1989, he was assigned to the Anti–Submarine Warfare Training Center in San Diego, California. Petitioner describes his experience of boot camp as follows:

> During Boot Camp, I was challenged from all directions, and the power of Christ moved me. I looked around and saw where I was, and was changed. I found myself learning and sharing the gospel. And I began to question my beliefs on war. Somewhere, in that span I accepted inside of me that I was not ever going to be able to agree with war.

This presented a [sic] obvious conflict ... [I] really didn't know what to do about it. I was scared. It was a thing of great pressure ... [T]he slightest form of aggression in any way made me uneasy, almost sick ... My soul was troubled. Signs of it all began to tell on my health ... Must [sic] of all, my general disposition; unhappiness. I know I was compromising faith.

Memorandum of Law in Support of Issuance of Writ of Habeas Corpus (hereinafter "Petitioner's Memorandum"), Exhibit A, p. 3. Petitioner decided to seek a discharge from the Navy as a CO.

On January 11, 1990, Petitioner filed a request for permission for leave to file a request for conscientious objector status with his commanding officer, who granted him permission. Then, on or about March 4, 1990, Petitioner filed an application for discharge on the grounds of conscientious objection to war. The Navy treated Petitioner's request in accordance with the provisions of 32 C.F.R. section 75 *et seq.*, and the Naval Military Personnel Manual (hereinafter "MILPERSMAN") 1860120 and 3620200, which govern the processing of requests for discharge as a conscientious objector.[1]

Petitioner was first interviewed by a Navy Chaplain, Commander Gerald R. Bruce, who stated in his report dated April 5, 1990 that Petitioner "has come to grips with the eternal conflict of Military Service and the Mandate, 'Thou shalt not kill.'" A.R. 23. He concluded that Petitioner was "most sincere about his beliefs and convictions and should be separated from the Navy for reasons of Conscientious objection." *Id.*

Petitioner was next interviewed by a Navy clinical psychologist, Dana Grossman, Ph.D., on April 20, 1990. Dr. Grossman found no evidence of mental illness. She concluded that Petitioner's "statement of being a conscientious objector appears consistent with his history and background, per his report of these. [Petitioner] does not appear to be malingering." A.R. 27.

After his interview with Dr. Grossman, Petitioner was interviewed by L.W. Hendrickson, a psychiatrist at the Training Center's Mental Health Unit, on May 9, 1990.[2] Dr. Hendrickson concluded as follows:

1. In addition to delineating the criteria for designation as a conscientious objector, MILPERSMAN 1860120 establishes procedures for the processing of applications for the designation. Under those procedures, an applicant for conscientious objector status is first interviewed by a chaplain, who is required to submit a written report setting forth his conclusions regarding the nature and basis of the claim and the applicant's sincerity and depth of conviction. MILPERSMAN 1860120.6. Next, the applicant is interviewed by either a psychiatrist or clinical psychologist, who reports on the presence of any psychiatric disorder. MILPERSMAN 1860120.7.

After these two interviews, the applicant's commanding officer must appoint a lieutenant commander (or higher ranked officer) who is not in the applicant's chain of command to investigate the conscientious objector claim. MILPERSMAN 1860120.9. If a qualified officer of this grade is not available, the commanding officer may appoint an officer of the grade of lieutenant who, in the opinion of the commanding officer, is well qualified to undertake the investigation by reason of age, education, training, experience, and length of service. A third alternative allows the commanding officer to appoint as investigating officer a judge advocate (attorney) with the rank of lieutenant or above.

MILPERSMAN 1860120.9. The investigating officer is charged, *inter alia*, with reviewing the entire record of the case, conducting a hearing on the application, and preparing a report setting forth his or her recommendations for disposition of the request. MILPERSMAN 1860120.9(b).

The investigating officer's report, along with the serviceman's application, reports of all interviews with chaplains and doctors, evidence received as a result of the investigating officer's hearing, and any other items submitted by the applicant in support of his case, constitutes the record. MILPERSMAN 1860120.9(j). A copy of the record is forwarded to the commanding officer who appointed the investigator. *Id.* At the same time, a copy is provided to the applicant, who is entitled to submit a statement in rebuttal. *Id.*

The entire record, with any rebuttal submitted by the applicant, is then submitted to the Commander, Naval Military Personnel Command, who is authorized to make a final decision on the request. MILPERSMAN 1860120.15(c).

2. It is unclear why Petitioner was interviewed by both clinical psychologist *and* a psychiatrist. According to MILPERSMAN 1860120.7, the applicant "is interviewed by either a psychiatrist *or* a clinical psychologist" (emphasis added).

I concur with Dr. Grossman's statement that there is no mental disorder. I also concur with her assessment that he is sincere. However, I find his beliefs to be superficially held and see no evidence that he is attempting to practice what he believes, with the exception of his seeking discharge from the Navy. I believe he is a sincere, bright [and] talented young man who has had difficulty establishing a life direction after trying several things, and who regrets his decision to enlist, which is contradictory to other ideas he has about his future like seminary or the law, both of which require higher education. This may be a case where sincerely held beliefs are being utilized in the service of release from a commitment he would prefer not to have made.

A.R. 25.[3]

In June 1990, Petitioner was assigned to Naval Submarine School in Groton, Connecticut. He told Naval authorities at Groton that he was a conscientious objector, and that he would refuse to fire nuclear weapons if ordered to do so. In accordance with Naval policy,[4] Petitioner was reassigned to noncombatant duties.

While at Groton, Petitioner became involved with the Friends, traveling monthly to Maine to attend the Durham Monthly Meetings.[5] On July 31, 1990, Petitioner published a statement on conscientious objection to participation in war and the military, which was incorporated into the Durham Monthly Meeting minute book:

> On the teachings of Our Lord, to love thine enemies, to love thy neighbors, and to refrain from killing, I stand in opposition to war and aggression and belligerence ... And as a present member, Seaman Apprentice, of the U.S. Navy, I state my conscientious objection to the here-to-for [sic] mentioned acts of war, belligerence, and aggression ... From this day forth, I commit myself as a witness for peace.

A.R. 32. In August 1990, Petitioner obtained letters of support for his application for a conscientious objector discharge from Delbert Brown, a Gordon College admissions officer, *see* A.R. 19, and from Pastor Ralph Greene of the Durham Monthly Meeting, *see* A.R. 33.

On October 12, 1990, the Commanding Officer at Groton appointed Lieutenant Thomas M. Gallagher, Judge Advocate General's Corps, U.S. Navy, an attorney, as the hearing officer to conduct the investigation into Leonard's claim of conscientious objection. In advance of the hearing, held on October 23rd,[6] Petitioner was advised of the date, and contacted Gallagher to confirm the date, time, and location of the hearing.

At the hearing, Gallagher advised Petitioner of its nature and purpose, Petitioner's right to counsel at his own expense,[7] the right to submit additional evidence, the right to make a verbatim record at his own

---

**3.** Petitioner rebutted this psychiatric interview in a memo to Lieutenant Gallagher, dated October 23, 1990. He stated:

> That interview ... was completed in a span of no more than 15 minutes maximum. Furthermore, to call it an interview is a bit too lenient: it was a discussion and she did most of it. The LCDR's questions either were baited or answered by her anyway. But most disturbing to me was the fact that she treated my belief in God's will, among other beliefs of faith, as a misconception of man. Almost as if man created faith to relieve himself of some task in life. I only asked a [sic] fair, respectful interview; to say that I received a complete one from her would be an untruth.

A.R. 34.

**4.** A member who requests discharge or noncombatant service for conscientious objection shall, to the extent practicable, be employed in duties that entail minimum conflict with asserted beliefs, pending a decision on the case. MILPERSMAN 1860120.2(b).

**5.** The stepfather of Petitioner's former Gordon College roommate is the pastor of that meeting.

**6.** No copy of the transcript of the hearing was provided in the Administrative Record.

**7.** MILPERSMAN 1860120.9(c) provides:

> If the applicant desires, he or she shall be entitled, at his or her own expense, to be represented by counsel who shall be permitted to be present at the hearing, assist the applicant in the presentation of his or her case, and examine all items in the file.

expense, the right to receive a copy of the Hearing Officer's report, and the right to rebut that report within five working days. Petitioner stated that he did not wish to retain his own lawyer and rejected the assistance of Navy counsel. He testified on his own behalf but did not call any witnesses. Gallagher considered the oral testimony, and documentary evidence, including the recommendation of discharge from Chaplain Bruce, the reports of Drs. Grossman and Hendrickson, and the letters of Delbert Brown and Pastor Greene.

Gallagher concluded in his written report and recommendation dated November 2, 1990 that Petitioner failed to establish his qualifications as a conscientious objector by clear and convincing evidence.[8] Gallagher asserted that Petitioner's position was not sincere and deeply held. He found that although Petitioner was able "to discuss in general terms the history and principles of the Quaker religion ... [h]e was unable to articulate how his attitude toward war, opinions about the military, or his behavior changed when he became a Quaker." A.R. 16. Gallagher also found that Petitioner "could not state how his life had been impacted by his religious beliefs, either before or after his enlistment" in the Navy. *Id.* Further, the report noted Petitioner's acknowledgement that:

> [H]is religious beliefs were well-established long before he enlisted in the Navy and he made no effort to assert any conscientious objection prior to his enlistment ... [and he] was well aware of the military mission and was also exposed to the issue of conscientious objection. Despite this exposure to the military, his own religion, and conscientious objection, he enlisted in the Navy.

*Id.* Gallagher further noted that Petitioner could not show how his Quaker beliefs directed his life in any way. Gallagher determined that Petitioner had not "appreciably changed his lifestyle" while in the Navy, and "his religious faith and objection

to war were not manifested in his daily conduct." A.R. 16. He concluded that although Petitioner was "sincere in leading a Christian life ... [h]is religious, moral and ethical values do not demonstrate ... that he has a sincere and deeply held opposition to war." A.R. 17. Accordingly, Gallagher recommended the denial of Petitioner's request for discharge.

On November 5, 1990, Petitioner submitted a written rebuttal, contesting a number of Gallagher's findings.[9] *See* A.R. 6–13. For example, Petitioner pointed out that his conscientious objection was not based entirely on the Quaker faith but had grown out of his dilemma of attempting to reconcile his role in the military with the teachings of Jesus Christ. He noted that his affiliation with the Quakers was based upon similarity of belief. A.R. 6.

Gallagher's finding was reviewed and adopted by Petitioner's Commanding Officer, Captain G.B. Lear, Jr., who recommended, in a brief memo to the Commander on November 9, 1990, that Petitioner's application for conscientious objector discharge be denied. A.R. 5. He stated that "it is my opinion that SN Leonard is sincere in his conviction to preclude violence in his life, but he falls significantly short of the requirements which would qualify him as a conscientious objector." *Id.*

The record was then reviewed in Washington, D.C. by Lieutenant Commander Douglas J. Olauson of the Navy's Chaplain Corps. Chaplain Olauson recommended against Petitioner's designation as a conscientious objector. He considered Petitioner to be a "person of faith with the desire to do what is right in his heart ... [and who] is searching for purpose and direction in his life." A.R. 3. Olauson stated that Petitioner's "[r]ecent choices regarding his Quaker faith is admirable but in their infancy. A deep understanding and soul changing conversion to his new faith doesn't appear to be there as of yet." *Id.* Olauson concluded that:

---

**8.** This burden of proof standard of clear and convincing evidence is established by 32 C.F.R. section 75.5(d) and MILPERSMAN section 1860120.14(d).

**9.** Petitioner stated that "a fair hearing was provided." A.R. 6. He indicated, however, that he had been given no advance notice of the hearing.

A question remains if his desire to be classified as a conscientious objector is due to his deeper understanding of 'Thou shalt not kill." The possibility is too great that SA Leonard is regretting his decision to join the Navy and has discovered an 'honorable' means to end his military obligations prematurely."

*Id.*

On November 29, 1990, the Commander of Naval Military Personnel Command issued his denial of Petitioner's request for designation as a conscientious objector and for discharge from the Navy. A.R. 1 [10] He stated in his denial that Petitioner's "beliefs appear to be new and developing and lack logical cohesion at this time." *Id.* He concluded that, "while [Petitioner's] beliefs may be sincere and are formulating, they are not the primary controlling force in [Petitioner's] life ..." *Id.*[11]

In January 1991, Petitioner was notified of pending orders to the U.S.S. MILWAUKEE, a fuel supply ship scheduled for deployment to the Persian Gulf to participate in Operation Desert Shield/Storm. On January 18, 1991, Petitioner left the Navy and sought refuge among the Friends in the State of Maine. Approximately five months later, on June 25, 1991, Petitioner surrendered at the Naval Air Station in Brunswick.[12] He filed his petition for writ of *habeas corpus* the next day on June 26th.

## II. *Discussion*

### A.

■ Federal *habeas corpus* is the well-established and appropriate jurisdictional route for federal district courts to review military decisions regarding applications for discharge on grounds of conscientious objection.[13] *See Parisi v. Davidson*, 405 U.S. 34, 35, 92 S.Ct. 815, 816–17, 31 L.Ed.2d 17 (1972). The Supreme Court clearly established this jurisdictional basis:

> When a member of the armed forces has applied for a discharge as a conscientious objector and has exhausted all avenues of administrative relief, it is now settled that he may seek habeas corpus relief in

---

**10.** A possible conflict exists in the record as to when Petitioner was notified of this decision. According to Respondents, he was informed of the decision by letter dated November 29, 1990. A.R. 1. Petitioner states that he was informed on or about January 2, 1991. Petitioner's Memorandum at 7. It is possible that the letter was dated November 29, 1990 but that Petitioner did not receive it until several weeks later.

**11.** The Commander also stated as the basis for his denial:

> Those personnel in the best position to objectively evaluate your request by studying the application and/or personally interviewing you were not convinced that you qualify as a conscientious objector. Neither the Commanding Officer, the Investigating Officer nor the Chaplain believe [sic] that you qualify for discharge as a conscientious objector.
>
> .     .     .     .     .
>
> Your application contained a minimal amount of information pertaining to your conscientious objection to war in any form. It also indicates that, while your beliefs may be sincere, they are not held to the extent that continued service would deny you rest and peace.

*Id.*

The Court notes that the Commander appears to state erroneously that the Chaplain concluded that Petitioner was not qualified for discharge as a CO. In fact, Chaplain Bruce recommended that Petitioner should be discharged from the Navy as a CO. *See* A.R. 23.

The other possible reading of the Commander's report is that he was referring to Chaplain Olauson, not Chaplain Bruce. In light of both Naval regulations, *see* MILPERSMAN 1860120.6, and the hierarchy of personnel listed in the report ("the Commanding Officer, the Investigating Officer nor the Chaplain ..."), however, the Court concludes that a fair reading of the report is that the Commander's reference was to Chaplain Bruce, not to Chaplain Olauson.

**12.** Desertion in Time of War is a violation of Article 85, Uniform Code of Military Justice (hereinafter "U.C.M.J."), 10 U.S.C. section 885, with a maximum punishment of death or such other punishment as a court-martial may direct. A lesser included offense is unauthorized absence, a violation of Article 86, U.C.M.J., 10 U.S.C. section 886. According to Respondents, "[a]lthough no formal charges have been lodged pending resolution of the Habeas Corpus petition, Naval authorities will likely charge Leonard with the lesser offense of unauthorized absence." Respondents' Memorandum in Opposition to the Petition for a Writ of Habeas Corpus (hereinafter "Respondents' Memorandum") at 11 n. 7.

**13.** The Court has jurisdiction over this matter pursuant to 28 U.S.C. section 2241 *et seq.* and 28 U.S.C. section 1391(e).

a federal district court on the ground that the denial of his application had no basis in fact.

*Id.*

Respondents argue that this Court does not have jurisdiction over this matter, based on a jurisdictional "test" that applies to constitutional challenges to petitioners' forced separation from the military, but does *not* apply to *habeas corpus* petitions regarding conscientious objection. *See* Respondents' Memorandum at 11–21 (citing *Walshe v. Toole,* 663 F.2d 320 (1st Cir. 1981); *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971)). The Court rejects Respondents' attempts to circumvent what is proper jurisdiction over Petitioner's petition for a writ of *habeas corpus.* Accordingly, the Court has jurisdiction to decide Petitioner's petition for a writ of *habeas corpus.*[14]

### B.

▉ The threshold test for conscientious objector status in the federal courts has been delineated by the Court of Appeals for the First Circuit:

In order to qualify for classification as a conscientious objector, a registrant must satisfy three basic tests. He must show that he is conscientiously opposed to war in any form. He must show that this opposition is based upon religious training and belief, as the term has been construed in our decisions. And he must show that this objection is sincere.[15]

*Hager v. Secretary of Air Force,* 938 F.2d 1449, 1454 (1st Cir.1991).[16] Once the applicant establishes a *prima facie* case, based on this tripartite test, the burden of proof shifts to the military to demonstrate affirmative evidence in the form of a "basis in fact" in the record, which provides a basis for the denial of the request for discharge. *See Estep v. United States,* 327 U.S. 114, 122–23, 66 S.Ct. 423, 427–28, 90 L.Ed. 567 (1946); *Hager,* 938 F.2d at 1454; *Goldstein v. Middendorf,* 535 F.2d 1339, 1341 (1st Cir.1976);[17] *Lobis v. Secretary of United States Air Force,* 519 F.2d 304, 309 (1st Cir.1975); *Bates v. Commander, First Coast Guard District,* 413 F.2d 475, 477 (1st Cir.1969). As the First Circuit noted:

**14.** There is no dispute that Petitioner meets other jurisdictional requirements. First, he meets the custodial requirements in that he is in custody within the territorial jurisdiction of the Court; namely, at the Naval Air Station in Brunswick, Maine. Servicemen who seek administrative discharge from the military are in custody within the meaning of 28 U.S.C. section 2241. *See Laxer v. Cushman,* 300 F.Supp. 920, 924 (D.Mass.1969).

Second, Petitioner has exhausted his administrative remedies. *See Parisi,* 405 U.S. at 35, 39, 92 S.Ct. at 816–17, 818–19. Of note, Petitioner is not required to appeal to the Board for the Correction of Naval Records before filing suit in federal court. *See Bouthillette v. Commanding Officer, Newport Naval Base,* 318 F.Supp. 1143, 1148 (D.R.I.1970); *Nason v. Secretary of Army,* 304 F.Supp. 422, 425 (D.Mass.1969).

**15.** With respect to sincerity of belief, 32 C.F.R. section 75.5(c)(2) provides:

A primary factor to be considered is the sincerity with which the belief is held. Great care must be exercised in seeking to determine whether asserted beliefs are honestly and genuinely held. Sincerity is determined by an impartial evaluation of the applicant's thinking and living in its totality, past and present. Care must be exercised in determining the integrity of belief and the consistency of application. Information presented by the

claimant should be sufficient to convince that the claimant's personal history reveals views and actions strong enough to demonstrate that expediency or avoidance of military service is not the basis of his claim.

Although the Department of Defense regulation, 32 C.F.R. § 75.5(a)(3), adds to the sincerity requirement that the belief also be "deeply held," neither the First Circuit nor the Supreme Court has included this element in its formulation of the tripartite test. *See, e.g., Witmer v. United States,* 348 U.S. 375, 382, 75 S.Ct. 392, 396, 99 L.Ed. 428 (1955); *Hager v. Secretary of Air Force,* 938 F.2d 1449, 1459 & n. 9 (1st Cir. 1991); *Armstrong v. Laird,* 456 F.2d 521, 522 (1st Cir.1972).

**16.** These three elements derive from federal regulations. Under C.F.R. section 75.5(a)(1)–(3) (1991), an applicant for discharge for conscientious objection has the burden of proving that: (1) the applicant is "conscientiously opposed to participation in war in any form; (2) the "opposition is founded on religious training and beliefs; and (3) the applicant's "position is sincere and deeply held."

**17.** The First Circuit noted in *Goldstein* that "[we do not] engage in 'substantial evidence' administrative review, much less do we make our own credibility determination from the cold record." *Id.*

[T]he ultimate question ... is the sincerity of the [applicant] in objecting, on religious grounds, to participation in war in any form. The Secretary's denial of the application must be supported by a statement of reasons, and will be upheld on review if there is a 'basis in fact' for the decision. Although this standard of review is a narrow one, it is not toothless.

.　.　.　.　.

'A basis in fact will not find support in mere disbelief or surmise as to the applicant's motivation. Rather, the government must show some hard, reliable, provable facts which would provide a basis for disbelieving the applicant's sincerity, or it must show something concrete in the record which substantially blurs the picture painted by the applicant.'

.　.　.　.　.

The reasons relied upon by the Secretary must be grounded in logic, and 'a mere suspicion is an inadequate basis in fact.'

*Hager*, 938 F.2d at 1454 (citations omitted). Under the "basis in fact" standard, judicial review of the administrative denial is restricted to the administrative record compiled by the Navy. *See Armstrong*, 456 F.2d at 522; *Bates*, 413 F.2d at 477 n. 2.

The First Circuit has overturned lower court denials of *habeas corpus* petitions where it has concluded no "basis in fact" existed for military denials of these petitions. *See, e.g., Hager*, 938 F.2d at 1455 ("[L]ate crystallization of conscientious objector convictions is not a sufficient basis in fact to reject the claim."); *Goldstein*, 535 F.2d at 1342 ("In his report the officer relies on three main grounds to support his conclusion of insincerity—demeanor, general credibility and timing."); *Lobis*, 519 F.2d

at 309 ("[W]e conclude that on the administrative record there appears no basis in fact for denying Captain Lobis' application for conscientious objector status ..."); *Armstrong*, 456 F.2d at 523 ("The statements of the members of the Review Board are unsatisfactory, confused, and internally inconsistent. There is no consensus.... It is impossible to determine on which grounds the Appeal Board made its recommendation.").[18]

Where courts have affirmed lower courts' denials of *habeas corpus* petitions, the "basis in fact" in the administrative record has seemed substantial. *See, e.g., Witmer*, 348 U.S. at 382–83, 75 S.Ct. at 396–97 ("[Petitioner's] inconsistent statements in themselves cast considerable doubt on the sincerity of [his] claim.... It would not be mere suspicion or speculation for the Board to conclude, after denying [petitioner]'s now-abandoned claims of farmer and minister, that he was insincere in his claim of conscientious objection."); *Rosenfeld v. Rumble*, 515 F.2d 498, 500 (1st Cir.) ("In answer to hypothetical questions, he took the position that he would personally bear arms, though not in a military unit, if a foreign nation crossed the territorial boundaries of this nation, having the avowed purpose of exterminating all Jews."), *cert. denied*, 423 U.S. 911, 96 S.Ct. 214, 46 L.Ed.2d 139 (1975); *Laxer v. Cushman*, 300 F.Supp. 920, 927 (D.Mass.1969) ("There was sufficient evidence before the Department of the Army to warrant the inferences that petitioner's request for discharge was not based upon any religiously motivated conscientious objection to participation 'in war in any form' but, instead, upon his objection to participation in the war in Vietnam.").[19]

*Lobis*, 519 F.2d at 307 ("[Petitioner]'s chronology was ... remarkably convenient, and we would not deny this factor some evidentiary weight on the issue of sincerity. But questionable timing has not by itself been deemed a basis-in-fact adequate for the military to reject as insincere an otherwise acceptable CO claim.").

**18.** In determining that no "basis in fact" exists for denial of petitions for conscientious objection, courts have considered various factors. For example, they have accorded some weight to the timing of the application for conscientious objector status, but they also note that timing "cannot alone constitute a basis in fact for denying conscientious objector status." *Hager*, 938 F.2d at 1456. *See also Goldstein*, 535 F.2d at 1344 ("This factor ... is not by itself a basis-in-fact for rejecting as insincere an otherwise acceptable C.O. claim, although, together with other evidence, it may be given weight.");

**19.** In *Laxer*, the court noted some of the evidence upon which it concluded that a basis in fact existed for the military's finding that the petitioner was insincere "in claiming that he was a conscientious objector by religious train-

■ The facts of the instant case are much more similar to those cases in which the First Circuit has overturned the lower courts' denial of petitions for writs of *habeas corpus*. For the reasons that follow, the Court disagrees with Respondents' denial of Petitioner's application, and it will grant Petitioner's writ of *habeas corpus*.

### C.

Here, the Court finds that first, Petitioner has established his *prima facie* case for classification as a CO [20] and second, in applying the applicable standard for reviewing in-service CO claims, *see Estep*, 327 U.S. at 122–23, 66 S.Ct. at 427–28; *Hager*, 938 F.2d at 1454; *Goldstein*, 535 F.2d at 1341; *Lobis*, 519 F.2d at 306, the Court finds that Respondents have failed to demonstrate affirmative evidence in the form of a "basis in fact" in the Administrative Record as the predicate for their denial of Petitioner's application for CO status and military discharge.

■ A *prima facie* case is established when the applicant "... makes nonfrivolous allegations of facts that ... if true, would be sufficient ... to warrant granting the requested reclassification, unless the truth of these new allegations is conclusively refuted by other reliable information...." *Borkenhagen v. Laird*, 392 F.Supp. 637, 639 (D.Mass.1975) (quoting *Mulloy v. United States*, 398 U.S. 410, 416, 90 S.Ct. 1766, 1771, 26 L.Ed.2d 362 (1970)). Here, based on the Administrative Record, the Court finds that Petitioner alleged such facts. *See* Request for Discharge from the Naval Service as a [CO], A.R. 19–22; Rebuttal to Investigating Officer's Report, A.R. 6–13; Additional Information & Rebuttal for Conscientious Objection Package, A.R. 34; Update on Initial Request, A.R. 35; and Friends Monthly Meeting minute book statement, A.R. 32. In addition to Petitioner's own statements in the record, the Court notes other facts, which include support letters, A.R. 31, 33; the findings of Navy Chaplain Bruce, A.R. 23; and the findings of Naval clinical psychologist Grossman, A.R. 26–27, all of which attest to the sincerity of Petitioner's objection to war in any form. Even certain Naval personnel who ultimately recommended denial of his application attested to Petitioner's sincerity. *See* A.R. 25 (Naval psychiatrist Hendrickson) ("I also concur with [Grossman's] assessment that he is sincere"); A.R. 5 (Commanding Officer Lear) ("[I]t is my opinion that SN Leonard is sincere in his conviction to preclude violence in his life."); A.R. 1 (Commander Ryan) ("[W]hile your beliefs may be sincere ..."). In sum, the Court concludes that Petitioner has established a *prima facie* case of conscientious objection.

Nonetheless, Respondents denied Petitioner's application for CO status and discharge. The Court finds that Respondents have failed to meet their burden in providing a "basis in fact" for such denial. First, as part of the prescribed evaluation process, Navy Chaplain Bruce interviewed Petitioner (for over one hour), concluded

---

ing and belief." 300 F.Supp. at 926–27. In his application for discharge, the petitioner stated:
> ... I enlisted in the army on May 12, 1967. I did not want to be drafted and placed in something like infantry or artillery. I chose and was given a medical MOS. It had not occurred to me to apply to Selective Service for [C.O.] Status because I felt that I could serve in the Army without violating my beliefs and principles.

.    .    .    .    .

> I must make it clear that I am not an absolute pacifist.

In the hearing officer's report, it stated:
> [Petitioner] completed his informal presentation with a statement that his beliefs were strong enough so that in no political situation could he allow himself to take part in hostili-

ties. He did temper this attitude by saying that he would, in defense of the nation, consider serving in a field such as medicine, caring for those who were defending our nation.

Lastly, at his trial before a Summary Court-Martial for being absent without leave, he was asked whether he would serve in the Army in a noncombatant duty assignment in a World–War–II type of war should it break out the next day. He replied that he would serve in that situation. *Id.* at 927.

**20.** Respondents argue that Petitioner has failed to establish that he is conscientiously opposed to war *in any form* or that his beliefs are sincere and deeply held. *See* Respondents' Memorandum at 29.

that Petitioner's beliefs were sincere, and recommended discharging him from the Navy based on his conscientious objection. *See* A.R. 23.[21] Next, the Navy psychologist, Dr. Grossman, concluded that Petitioner's "statement of being a conscientious objector appears consistent with his history and background" and that he did not appear to be malingering. *See* A.R. 27. Moreover, Dr. Hendrickson, a Navy psychiatrist, although stating that Petitioner's religious beliefs were "superficially held," concluded that these beliefs were sincere. A.R. 24–25.

Next, with respect to the hearing officer's report, Lt. Gallagher concluded that Petitioner does "maintain a sincere and deeply held belief in being a good Christian person," but that his "religious, moral and ethical values do not demonstrate … that he has a sincere and deeply held opposition to war." A.R. 17. Gallagher based this conclusion on four points:

First, his religious beliefs have always centered on christianity, but were never focused on any particular faith. Second, his religious beliefs were well-established long before he enlisted in the Navy and he made no effort to assert any conscientious objection prior to his enlistment. Prior to his enlistment, SA Leonard was well aware of the military mission and was also exposed to the issue of conscientious objection. Despite this exposure to the military, his own religion, and con-scientious objection, he enlisted in the Navy. Third, while in the Navy, he has not appreciable changed his lifestyle. His religious faith and objection to war are not manifested in his daily conduct. He feels that his personal behaviour and conduct have not changed since becoming a Quaker. In other words, he feels that he was a "good Christian" before he joined the Navy and he is still a "good christian" today. Fourth, he became a Quaker, but infrequently attends meetings and does little else other than read the bible to practice his faith.

A.R. 16–17. The Court finds that these grounds do not provide the requisite "basis in fact" to support Gallagher's recommendation of denial of Leonard's application. First, a petitioner does not have to profess a particular faith. *See* 32 C.F.R. § 75.-3(b);[22] *United States v. Seeger*, 380 U.S. 163, 166, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965); *Bates*, 413 F.2d at 479–80. Therefore, the Court rejects this ground as a "basis in fact" for Gallagher's findings.

Next, the Court finds that the fact that Petitioner did not assert a conscientious objection prior to his enlistment is meritless. *See Hager*, 938 F.2d at 1455; *Lobis*, 519 F.2d at 307. Such reasoning was criticized by the First Circuit, which noted that it would preclude any armed forces' member from ever qualifying as a conscientious objector. *See Bates*, 413 F.2d at 478.[23]

---

**21.** One factor that the First Circuit seems to have held to be significant in overturning lower courts' denials of petitioners' applications for conscientious objector status is the military chaplains' finding of sincerity. *See, e.g., Goldstein*, 535 F.2d at 1340 ("The chaplain found [petitioner's] beliefs sincere and recommended granting C.O. status."); *Bates*, 413 F.2d at 477 ("The chaplain reported, 'I believe Bates is honest about his position as a conscientious objector. * * * I recommend approval of his request to be discharged as a conscientious objector.' ").

**22.** This provision specifically states in pertinent part:

*Religious training and belief.* Belief in an external power or being or deeply held moral or ethical belief, to which all else is subordinate or upon which all else is ultimately dependent, and which has the power or force to affect moral well-being. The external power or being need not be of an orthodox deity, but may be a sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of another, or, in the case of deeply held moral or ethical beliefs, a belief held with the strength and devotion of traditional religious conviction. The term 'religious training and belief' may include solely oral or ethical beliefs even though the applicant himself may not characterize these beliefs as 'religious' in the traditional sense, or may expressly characterize them as not religious. …

32 C.F.R. § 75.3(b).

Similarly, the MILPERSMAN states in relevant part that "[c]hurch membership or adherence to particular theological tenets are not required to warrant separation or assignment to noncombatant training and service for conscientious objectors." 1860120(14)(2).

**23.** The *Bates* court noted:

But by holding that petitioner's present claim is inconsistent with his prior voluntary enlist-

Moreover, the First Circuit has held that timing "cannot alone constitute a basis in fact for denying conscientious objector status." *Hager*, 938 F.2d at 1456. Even where it noted that petitioner's timing was "remarkably convenient," the First Circuit still held that "questionable timing has not by itself been deemed a basis-in-fact adequate for the military to reject as insincere an otherwise acceptable CO claim." *Lobis*, 519 F.2d at 307.[24] Therefore, the Court also rejects the ground of "timing" as a "basis in fact" for Gallagher's finding.

Third, Gallagher's claim that Petitioner has not appreciably changed his lifestyle and that his religious faith and objection to war are not manifested in his daily life must be similarly rejected. The First Circuit has characterized such a finding as "of minor significance at best." *See Hager*, 938 F.2d at 1457; *Goldstein*, 535 F.2d at 1343 n. 6; *Lobis*, 519 F.2d at 307 n. 2. Here, even if this factor were significant, Gallagher fails to identify any part of the record in support of his finding. Again, the Court rejects this third ground as a "basis in fact" for Gallagher's finding.

Lastly, Gallagher's fourth assertion seems equally meritless. First, Petitioner's conscientious objection beliefs are broader than his Quaker faith. Second, Gallagher wrongly interprets the degree of Petitioner's involvement with the Friends. The

hearing officer similarly characterized the petitioner's involvement with the Friends in *Bates*. The First Circuit rebutted that hearing officer's claim that "[i]f [petitioner] was truly religious and did espouse the tenets of the Society of Friends, as he claims, I believe he would have done more than carry on a few casual conversations with members of the Society of Friends he has happened to meet." *Bates*, 413 F.2d at 479. The *Bates* court noted that "petitioner said he had talked with Friends, found his beliefs to be strongly aligned with theirs and indicated that he planned to 'follow up' the relationship after his present situation was resolved." *Id.* at 480. Here, Petitioner has done more than merely assert plans to "follow up" his relationship with the Friends. He lived with the Friends during his five months of unauthorized leave and he has attended Friends meetings.[25] Thus, his relationship with the Friends appears to exceed the level that the First Circuit found noteworthy in *Bates*. In sum, the Court finds that the hearing officer's report did not provide the requisite "basis in fact" to support his recommendation for denial of Petitioner's request.

Some of the subsequent evaluations of Petitioner's Request for Discharge seem based primarily on Gallagher's report.[26]

ment, the Commandant puts him in a "hanged if he does, hanged if he doesn't" predicament. Under DOD Directive 1300.6 IV B2, conscientious objection will not be considered unless it arose after induction or enlistment. By the Commandant's reasoning, therefore, petitioner's claim cannot be considered if it arose prior to his enlistment and is evidence of insincerity if it arose afterwards. By the force of this logic, no member of the armed services could ever qualify as a conscientious objector.
*Id.*

**24.** Here, the Administrative Record contains no evidence that Petitioner's timing was convenient, let alone "remarkably convenient." There is no suggestion in the Record that Petitioner was motivated at all by "convenience" in seeking CO status and military discharge.

**25.** Petitioner noted in his Rebuttal that:
I attend the meeting as frequently as possible (1 to 2 times a month). This is reflective of two very important factors: 1) My home

meeting is in Durham, Maine—4 [and one-half] hours from Groton, and quite expensive to travel once a week and further conflicts with duty; 2) I have not attended locally as I am instead now to [sic] broad Quaker way (note: the Court could not clearly decipher Petitioner's handwriting here); the church in Maine is semi-programmed with pastor and the one's [sic] around Conn. are 'silent' or unprogrammed. I would not find it as beneficial at this point in my growing in the Quaker faith to attend such meetings.
A.R. 8.

**26.** As the First Circuit noted in *Hager*, "[b]ecause the Secretary necessarily relies on the opinions and recommendations of his subordinates, it is the reports of the chaplain and the investigating officer to which we must look for a basis in fact to uphold the decision." 938 F.2d at 1449 (citing *Goldstein*, 535 F.2d at 1341 (reviewing underlying findings of investigating officer that had been 'subsequently ratified by the Secretary.' ")).

First, Commanding Officer Lear's report is entitled "First Endorsement on Lt. Thomas M. Gallagher, JAGC, USN, ltr of 2 Nov 90." *See* A.R. 5.[27] Second, the Commander's report states that its denial of Petitioner's request is based in part upon the findings of the Investigating Officer. *See* A.R. 1. Hence, these reports are subject to the same defects that the Court has found in Gallagher's report.

With respect to Chaplain Olauson's report,[28] he notes that Petitioner's "[r]ecent choices regarding his Quaker faith is admirable but in their infancy. A deep understanding and soul changing conversion to his new faith doesn't appear to be there as of yet." A.R. 3. The First Circuit has noted that, where there is a finding of sincerity, "whatever the stage of development of petitioner's insight, it is of no consequence to this inquiry." *Bates*, 413 F.2d at 480. Here, Petitioner's sincerity has not been disputed by various parties who have evaluated his request for discharge. In light of the First Circuit's rejection of the level of development of a petitioner's religious beliefs, Chaplain Olauson's conclusion that Petitioner's choices regarding his Quaker faith are "in their infancy" is of little import. Moreover, the Court has already noted that Petitioner's

conscientious objector beliefs encompass his identity as a Christian and are not limited to his Quaker identity. Again, as the Supreme Court, *see Seeger*, 380 U.S. at 166, 85 S.Ct. at 854, and the First Circuit, *see Bates*, 413 F.2d at 479–80, have noted, a petitioner does not have to profess any particular faith.

With respect to the Commander's report, he stated that his conclusion was based in part upon the reports of Commanding Officer Lear, Investigating Officer Gallagher, and Chaplain Bruce. The Court has already noted its concerns regarding Lear's and Gallagher's reports. Furthermore, the Court has pointed out that the Commander erroneously concluded that the Chaplain did not believe that Petitioner qualified for discharge as a CO.[29]

The Commander also states that Petitioner's application "contained a minimal amount of information pertaining to [Petitioner's] conscientious objection to war in any form." A.R. 1. On the contrary, the Court finds that Petitioner provided the Navy with what it regards as ample information on this point, including his written rebuttal to Gallagher's report,[30] his "Request for Discharge from the Naval Service as a Conscientious Objector" dated March 4, 1990,[31] Chaplain Bruce's memo-

---

Similarly, the Court here, in evaluating the "basis in fact" for the recommended denial of Petitioner's application by Commanding Officer Lear and Commander Ryan, relies in part on the recommendations of their subordinates.

**27.** The report itself is a brief, seven-line memorandum. *See id.*

**28.** It is unclear why Chaplain Olauson evaluated Petitioner in that the regulations identify only the following personnel to participate in the evaluation of requests for discharge based on conscientious objection: Chaplain (Bruce); psychiatrist or clinical psychologist, or medical officer, if either of the former are not reasonably available (Hendrickson and Grossman); investigating officer (Gallagher); commanding officer (Lear); and, finally, the Commander, Naval Military Personnel Command (Ryan). MILPERSMAN 1860120.

**29.** *See supra* note 11.

**30.** He stated in his rebuttal that Gallagher "didn't ask directly my beliefs on war ..." A.R. 12.

**31.** In his Request, Petitioner stated the following regarding his conscientious objection to war in any form:

My beliefs on war warrant no exception for accepting it as ever justifiable. This stems from my personal relationship with Jesus Christ. The teachings of Christ, the basis for all Christianity, are so understood by myself that I have arrived as a conscientious objector of war. Christ's main commandments tells us to first, Love God with all our heart, strength, and soul (Matthew 22:37), and second, to love thy neighbor as thyself (Matthew 22:39–40). Further, he tells us a man of God loves his enemies (Luke 6:35). In light of these teachings, the loss of life by means of war, directly or indirectly, are not ways of following these commands. Even more, I hold man to be created in God's image and whatever we do unto our fellow man we are doing to Him, and in turn, to Jesus Christ (Genesis 1:26–27); Matthew 25:34–36). Thus, war, the loss of life through it, and any form of aggression of relationship to it, is an act against Christ, and God himself. Perhaps most important, however, the commandments handed down to

randum,[32] Petitioner's Supplement to [CO] Status Request,[33] letters written by Delbert Brown, *see* A.R. 31, and Pastor Ralph Greene, *see* A.R. 33, and Petitioner's statement on conscientious objection to participation in war, *see* A.R. 32. In light of the aforementioned information included as part of the Administrative Record, the Court concludes that such information is more than "minimal" and, therefore, it rejects this factor as a "basis in fact" for denying Petitioner's request.[34]

With respect to the Commander's final consideration, the Court agrees with Petitioner's assessment of this factor as "nothing but a restatement in different words of the previously mentioned grounds." Petitioner's Memorandum at 19. First, the Commander's assertion that Petitioner's "application failed to provide sufficient evidence that [his] new beliefs are in conflict with [his] military duties," A.R. 1, seems to restate simply the Commander's prior contention regarding Petitioner's application containing a minimal amount of information, which the Court has already addressed. Second, his statement that Petitioner's "beliefs appear to be new and developing and lack logical cohesion" seems to be a restatement that Petitioner's beliefs

are not deeply held. The earlier criticism of Chaplain Olauson's report applies here as well; that is, the First Circuit has noted that, where there is a finding of sincerity, "whatever the stage of development of petitioner's insight, it is of no consequence to this inquiry." *Bates*, 413 F.2d at 480. Moreover, as Petitioner points out, his "beliefs concerning conscientious objection had to be new in order for him to qualify for such a discharge." Petitioner's Memorandum at 19 (citing 32 C.F.R. § 75.4(a)(1) (1990); *Bates*, 413 F.2d at 478). Lastly, the Commander's conclusion that Petitioner's beliefs, though they may be sincere, "are not the primary controlling force in [his] life," is a bald assertion without substantiation, and one that seems to parrot simply the language of the regulations.[35] Thus, the Court finds that the Commander's report is not grounded in the requisite "basis in fact" to support Respondents' denial of Petitioner's application.

In sum, based on the Administrative Record before it, and upon which Respondents' denial of Petitioner's application for conscientious objector status and military discharge is based, the Court finds that Petitioner has established his *prima facie* case for conscientious objection and that no

Moses include, "Thou shalt not kill!" (Exodus 20:13). This is not a rule for compromise or qualification—thou will not kill, period! As a final factor, Christ told his disciples to "Give to Caesar what is Caesar's, and to God what is God's" (Matthew 22:17–22). It is not enough that I pay taxes which will go to this day and age's Caesar (the government); some of which will surely fall into the hands of the military, Department of Defense, and the like. So your Caesar is getting what is his, money. Everything else, my life and my time, well, those are God's, so I don't believe in serving any facet of war/defense, what-have-you that will have something to do against these beliefs. I wish to devote these things to God and His will. In summation, man cannot serve two masters. My master is Jesus Christ, my Lord, His word I obey—before family and country. A.R. 20. In the same report, he also stated that "War is wrong; always. It is a breach of my faithful service to Jesus Christ ... Thus, I cannot accept war and its instruments of aggression under any circumstance or relationship. Period. *Id.* at 22.

**32.** Chaplain Bruce stated that he believes that Petitioner "has come to grips with the eternal

conflict of Military Service and the Mandate, 'Thou shalt not kill.'" A.R. 23.

**33.** In his Supplement, Petitioner states: "I am specifically requesting a class 1–0 conscientious objector status as a person who sincerely objects to participation of any kind in war in any form ..." A.R. 28.

**34.** The Commander also states that, although Petitioner's beliefs may be sincere, "they are not held to the extent that continued service would deny you rest and peace." A.R. 1. The Commander does not provide the basis for his conclusion that Petitioner's beliefs, though sincere, are not deeply held.

**35.** The regulations state that "the belief upon which conscientious objection is based must be the primary controlling force in the applicant's life." 32 C.F.R. § 75.5(c).

The First Circuit noted in *Hager* that the use of "boilerplate" language is not improper "so long as the reasons relied upon are reasonably discoverable from the record." 938 F.2d at 1455. The Court is not persuaded that Respondents meet this test here.

"basis in fact" exists for such denial. The Court finds that Respondents have failed to show either "some hard, reliable, provable facts" that would provide a basis for disbelieving Petitioner's sincerity or "something concrete in the record which substantially blurs the picture painted by the applicant." *Hager*, 938 F.2d at 1454.

Accordingly, it is hereby ORDERED that Petitioner's petition for a writ of *habeas corpus* be, and it is hereby, GRANTED, and it is further ORDERED that Respondents should discharge S.A. Stephen K. Leonard from their custody and from the United States Navy.